**In re George J. BARONTI, Debtor.**

**George J. BARONTI, Plaintiff,**

**v.**

**Christopher M. WARMAN, an individual, Joni Schubert, an individual, Christopher M's Ross Park Mall Elmer's Fudge, a partnership, and Christopher M's Hand Poured Fudge, Inc., a corporation, Defendants.**

**Bankruptcy No. 94–20940 JKF.**
**Adv. No. 95–2122.**

United States Bankruptcy Court,
W.D. Pennsylvania.

March 31, 1997.

---

**15.** The $14 lien fee was assessed against Triad in 1987. *See* Debtor's Exhibit 2.

James E. Miscavage, Pittsburgh, PA, for Debtor.

John R. Cook, Pittsburgh, PA, for Defendants.

## MEMORANDUM OPINION [1]

JUDITH K. FITZGERALD, Bankruptcy Judge.

This adversary proceeding arises out of an unsuccessful franchising venture for fudge retail between Debtor and defendants.[2] This fact-specific proceeding requires the court to determine the balance of money due and owing between the parties as the result of their complex business dealings. Each party contends that the other owes it money and denies any additional liability to the other except for certain stipulated sums.

The facts of this case are paramount. Debtor was looking for a business opportunity and, after meeting with Christopher Warman, decided to enter into a franchising agreement under which Debtor would purchase a kiosk and sell Warman's fudge at the Ross Park Mall. One important term of the agreement was that Warman would repurchase the Ross Park Mall kiosk from Debtor, pursuant to a written contract, if Debtor chose to sell it. Debtor opened the Ross Park Mall kiosk for business in early 1991. Debtor purchased fudge from Warman and sold it at retail. His business was doing so well that Debtor decided to open another kiosk. In November, 1991 Debtor designed, built, and opened a kiosk in the Monroeville Mall which was substantially larger than that at Ross Park Mall. Initially, the Monroeville Mall site was profitable.

Debtor decided to sell the Ross Park Mall kiosk toward the end of 1992, while it was profitable, so that he could develop a storefront site in Warman's property in the Strip District area of Pittsburgh, Pennsylvania. Warman agreed to repurchase the kiosk from Debtor and the parties settled on a price of $20,000. A written contract was signed. Soon thereafter, Debtor's Monroeville Mall site began to have financial problems. Ultimately, Debtor was unable to meet his Monroeville rent obligations and was evicted. Subsequently, Debtor filed this Chapter 13 bankruptcy.

Debtor initiated this adversary proceeding to recover money which he asserts is due from the payments and credits arising from the transactions between the parties under the franchise agreement. The transactions fall into four categories:[3] (1) the purchase of fudge by Debtor, (2) rent due from Debtor pursuant to a lease of Warman's property in the Strip District, (3) the contract price for the alleged sale of the Monroeville Mall kiosk from Debtor to Warman, and (4) interest at the contract rate of 18 percent for any unpaid balance due on Warman's repurchase of the Ross Park Mall kiosk from Debtor. Warman denies that he owes money (except for the stipulated sum of $12,900.70) to Debtor. Warman contends that after offsetting payments and credits for fudge and miscellaneous sales and loans, and considering unpaid rents still due from Debtor for the Strip District site, he is owed money. Furthermore, Warman denies any contract to purchase the Monroeville Mall kiosk. Warman admits having entered into a written agreement to purchase the Ross Park Mall kiosk,

---

1. The court's jurisdiction is not in dispute. This opinion constitutes our Findings of Fact and Conclusions of Law.

2. Defendant Joni Schubert died during this proceeding and was dismissed from the action by agreement of the parties. At various times defendants traded under different names that are the individual, partnership and corporate identities listed in the case caption. The parties stipulated that any obligation owed by any defendant to Debtor was joint and several. As a result all references to any or all defendants will be to "Warman" or to "defendants" in this opinion.

3. There also were transactions concerning the sale of miscellaneous items and for various loans between the parties but they have accounted for these in the stipulated sum.

but contends that he has satisfied his payment obligation under that contract.

After trial concluded, the parties filed Joint Proposed Findings of Fact that summarize the disputes. *See* Docket # 47. They have stipulated that after all agreed upon adjustments are made, Warman owes a balance to Debtor of $12,900.70 subject to further adjustments by the court on all remaining disputed transactions. *See* Docket # 47, § I(5). Accordingly, the court will use this number as its starting point to assess the respective damages of the parties.

### (1) Fudge

The first task is to determine the validity and amounts of setoffs and credits which arose during the sales of fudge. Both parties rely chiefly upon documentary evidence: (1) invoices prepared by Warman which, in most instances, show the quantity and price of fudge shipped, the amounts due, and the payments, prepayments or credits applied to each transaction; and (2) checks issued by Debtor as payment on the invoices.

The majority of the invoiced transactions were stipulated to by the parties. There are, however, several which remain disputed. This court finds the accounting by defendants' witness, Christine Warman, to be credible.[4] Christine Warman testified that she searched Warman's records, copied those in dispute, and assembled the accounting. She testified that she had no personal knowledge of the information contained in the records but analyzed the data she collected. Included in her analysis of payments, invoices and credits for the sale of fudge were copies of the invoices showing orders, shipments and payments. The supporting documents were produced in the ordinary course of business at the time of the sales, shipment and payment of the goods. In some instances, the invoice failed to identify Debtor either by name or by business location in the "bill to" or "ship to" sections. However, Christine Warman traced each invoice and payment and reconciled the data. We credit her testimony and accept her analysis that each of the disputed invoices is attributable to a purchase of fudge by Debtor.

By contrast, Debtor did not credibly refute Ms. Warman's testimony. The documents were Warman's ordinary course of business records and reflected each item in dispute. Ms. Warman's testimony reconciled the balances. Christine Warman explained how Debtor's canceled checks and credits for returns and exchanges plus prepayments and cash payments were applied on the relevant invoices. We find the defendants' documents to be sufficiently specific, coupled with the testimony, to substantiate Warman's position that Debtor owes defendants $20,091.36 for fudge. *See* Joint Proposed Findings of Fact, Docket # 47, § V(2).

### (2) Strip District Rent

The second matter is Warman's claim that Debtor owes back rent for the Strip District property. The parties stipulated that Debtor owes $600 under the initial lease. However, the parties extended the lease term and Warman asserts that Debtor's obligation was $4,000 on the extension. Warman conceded that Debtor had paid $1,200 toward the additional rent, and asserts that he still owes the difference of $2,800. Debtor claims he owes nothing pursuant to the extended lease. The disparity stems from rental payments that Debtor asserts he made in cash. Debtor claims that he never received receipts for cash payments, although Warman contends that he signed and returned receipts that had been prepared by Debtor. Warman admits that Debtor made some cash payments, however but for the $1,200 he concedes he received, the number and amount of cash payments are matters of pure speculation. Warman, who has the burden of proof on this issue, had no records of any sort to substantiate an amount owing that exceeded the $600 that Debtor admits he owes under the initial lease.

Based upon the lack of evidence of the amounts of cash payments on the lease extension, this court concludes that the only debt proven to a preponderance which Debtor owes for unpaid rent is the stipulated $600 from the initial lease. We credit the testimony of Debtor on this point.

---

4. Christine Warman married Christopher Warman during the course of these proceedings. She is an employee of defendants who has current bookkeeping responsibilities.

### (3) Monroeville Mall Kiosk Purchase

■ Next, Debtor contends that Warman owes him $20,000 pursuant to an oral contract by which Warman would repurchase the Monroeville Mall kiosk upon Debtor's request. There is no written evidence of such an agreement. Instead, Debtor relies solely upon his own testimony of this oral agreement and brought in two witnesses regarding buy-back agreements for other kiosks unrelated to this transaction. Warman disputes the existence of an oral buy-back agreement.[5] Warman testified that he did not agree to repurchase this kiosk when Debtor opened the Monroeville Mall store. The issues to be decided on this point are whether the evidence supports Debtor's contentions that a contract was formed and, if so, whether the terms are sufficiently detailed to be enforceable. To be enforceable, the terms of a contract must be sufficiently definite or reasonably certain, but courts will enforce contracts whose terms lack clarity or which contain missing terms, provided that an appropriate remedy can be fashioned. RESTATEMENT (2d) OF CONTRACTS § 33(2).

The evidence established that the parties discussed the repurchase from time to time and Warman acknowledges that he told Debtor that he would buy the kiosk and pay something for it if he had a use for it.[6] In Warman's view, this discussion gave him the option to purchase the unit if he could sell it to a third party. Warman brought prospective purchasers of the business to Monroeville Mall in an effort to assist Debtor in selling the franchise. None of the efforts resulted in a sale. Debtor contends that, although there was no purchase price established at the time the oral agreement was made, Warman agreed to buy back the kiosk for $20,000, although Debtor wanted $30,-000.[7] Warman denies any agreement as to price.

■ We credit Warman's testimony that he had franchised 40 kiosks and had six or fewer buy-back agreements in all. Nonetheless, the court's duty is to reconcile the evidence and, in this case, the conduct of the parties and testimony of the witnesses is consistent with Debtor's assertion that an oral agreement was reached. Four specific examples of such conduct are:

(a) Warman had discussions with Debtor on various occasions about the decline in business. After the Christmas season in 1992, Warman was aware that Debtor was not operating profitably in Monroeville and wanted to sell the business. Warman wanted to keep a kiosk in Monroeville. Eventually, Debtor was not able to keep up the rent so the Mall wanted him to remove the kiosk. While the Mall pursued eviction against Debtor, it also negotiated a month-to-month lease with Warman, and Warman actually used the kiosk at the Monroeville Mall for the eight months from June 1, 1993, through February 28, 1994, when he, too, closed the business because it was not profitable. Warman did not pay Debtor for the use of the kiosk.

(b) After Debtor was served with his eviction from the Monroeville Mall, he left the kiosk in the Mall. After using it for eight months, Warman removed the Monroeville Mall kiosk at his own expense (approximately $700) and put it in storage in the Strip District.

(c) Although the kiosk has been in storage for the majority of the time since its removal, Warman admits using it once, for a period of about two days.

(d) When Debtor's financial troubles at Monroeville Mall began, he and Warman undertook a search to find a purchaser for that

5. Defendants did not raise the statute of frauds. Because the statute of frauds is an affirmative defense pursuant to Rule 8(c) of the Federal Rules of Civil Procedure, this court need not decide whether it applies to the sale of the Monroeville Mall kiosk.

6. In 1992 and 1993, when these events occurred, Warman's primary source of revenue was from supplying kiosks.

7. Debtor testified to his knowledge of a written contract Warman had with a different franchisee, unrelated to this transaction, in which Warman agreed to buy back the kiosk for an unspecified price.

franchise. One prospective buyer, Donald Tucci, was a friend of Debtor's and a former franchisee of Warman's at a retail outlet on Staten Island. Tucci testified about the Staten Island deal and noted that Warman had repurchased his kiosk when the store closed.[8] Tucci was interested in starting another franchise. He met with Debtor and Warman at the Monroeville Mall to see the operation and discuss terms. Tucci testified that Debtor and Warman wanted a total of $30,000 for the franchise and that, as part of the deal, Warman agreed to repurchase the kiosk from Tucci as long as Tucci operated it for at least one year. Tucci did not buy the franchise. We credit Tucci's testimony that Warman promised to repurchase the Monroeville kiosk on the conditions stated, not merely suggesting an option to do so as Warman opined at trial.

These events establish that Warman had uses for Debtor's kiosk and dealt with the unit as though he owned it. Thus, Debtor has proven to a preponderance of the evidence the oral agreement to repurchase.[9]

Debtor has failed to carry his burden of proof as to the price, however. Debtor testified that he wanted $30,000 but Warman agreed only to $20,000. Debtor's statement conflicts with the $30,000 figure offered to Tucci as the sales price for the entire franchise, and we do not credit it. Warman testified that he made no such agreement and that new kiosks can be purchased for between $6,000 and $12,700.

■ Price is an essential element of a contract for the sale of property. The price must be sufficiently definite or capable of ascertainment from the contract. *Portnoy v. Brown*, 430 Pa. 401, 243 A.2d 444 (1968) (citing *Thomas v. St. Joseph's Polish Nat. Catholic Church of McKees Rocks*, 343 Pa. 328, 22 A.2d 661 (1941)). Despite this general rule, there is authority for the proposition that the court may supply the price as an essential term when it is missing from a contract.

■ In *Crawford's Auto Center, Inc. v. Cmwlth. of Pa. State Police*, 655 A.2d 1064 (Pa.Cmwlth.), *allocatur denied*, 542 Pa. 651, 666 A.2d 1059 (1995), the court discussed implied contracts and quasi contracts. The court described an implied contract as one in which the parties have agreed to make a contract, failed to express their intention in words, but implied an agreement by their conduct under the circumstances. In *Crawford's Auto Center* the parties had not agreed on a price for towing services. The court found that a contract existed, that services had been provided, and that the Commonwealth's promise to pay a reasonable price could be inferred. The court cited the RESTATEMENT (2d) OF CONTRACTS § 204 (1981) for the proposition that when parties intend to enter into a contract but have omitted an essential term such as price the court should supply a reasonable term under the circumstances in light of community standards of fairness and policy.[10] 655 A.2d at 1069–70.

■ In the case at bench, Warman stated that he agreed to pay something for the kiosk. The evidence establishes to a preponderance that the contract omitted an essential term, i.e., the price. Because we conclude that an agreement existed that Warman would purchase the kiosk but the parties neglected to agree on a price, we must determine a reasonable price in light of community standards of fairness and policy. *Crawford's Auto Center, Inc. v. Commonwealth of Pa. State Police*, 655 A.2d 1064, 1069–70 (Pa.Cmwlth.1995).

---

8. Tucci returned the unit to its manufacturer for a credit against the balance owed and Warman reimbursed Tucci for the payments he had made.

9. The experience with Tucci, however, did not establish that Warman agreed to pay Debtor $20,000 for the kiosk, although Debtor wanted $30,000. The $30,000 amount discussed between Warman and Tucci was for the franchise, not the kiosk.

10. Because the Pennsylvania Supreme Court had not adopted the theory of implied contracts the court in *Crawford's Auto Center* also examined the doctrine of quasi contract whereby a duty is imposed by law, not because of an express or implied promise to pay by a party but despite an intention to the contrary. 655 A.2d at 1070. The doctrine operates to effect a form of restitution to avoid unjust enrichment. *Id.* at 1070–71.

The testimony of both parties leads to the conclusion that the Monroeville Mall kiosk had value. First, Debtor testified that he believed that the kiosk was worth at least $20,000 based upon his cost of materials and labor in building it. Warman contends that this is a vast overstatement because new units can be purchased for $6,000 to $12,700 and because this unit had been used for about one and a half to two years. Warman agreed that some minimal range of value applies to a used kiosk.[11] Second, Warman testified that he would have bought the kiosk if he believed it was useable. Warman's statement is particularly noteworthy since he actually used the kiosk at the Mall for eight months and elsewhere on one other occasion. Thus, it was useable. Third, the kiosk had intrinsic value to Warman, even though this particular kiosk was never supplied to any franchisee, because the rental of kiosks was a major part of his business at the time. Finally, this court looks again to the fact that Warman incurred expenses of about $700 to remove the kiosk from the Monroeville Mall. If the kiosk had no value, abandoning it would have saved Warman $700. Therefore, we find defendants liable for the value of the kiosk.

From the evidence of record, there are two methods of valuing the kiosk. Debtor's method would value it at $20,000 in place, without a wear and tear allowance, as the alleged cost of his materials and assembly. Alternatively, Warman's testimony places the range of value for a new kiosk somewhere between $6,000 and $12,700. Warman's deposition testimony asserts that the value of a kiosk decreases with use, and that the condition of this kiosk after one and a half to two years of use at the time it was removed was very poor. He values it at not more than $1,000. Considering its size,[12] the lack of any evidence that third party buyers were willing to purchase it, Warman's testimony that its

construction was poor, plus the lack of any documentary evidence to support Debtor's testimony that it cost him $20,000 to build, and crediting Warman's testimony that similar units can be acquired for $6,000 to $12,700, we adopt the lower end of the spectrum of values. Accordingly, we find the value to be $6,000 and will use that sum in our calculations.

(4) Interest On Ross Park Mall Kiosk Sale

Finally, Debtor claims interest due from Warman on alleged payment defaults for the Ross Park Mall kiosk sale, based upon a written contract. See Exhibit 1 to the Second Pretrial Stipulation, Docket # 37. Debtor's interest in this unit was perfected by appropriate UCC filings. The parties agree that the principal price Warman agreed to pay was $20,000. The parties dispute whether there is any unpaid balance on the contract and, if so, how much. However, the parties' stipulation of the opening balance of $12,900.70 accounted for any default in principal and only the unpaid, accrued interest is in dispute. The need to assess the unpaid principal, therefore, relates only to the calculation of interest due, if any. See Joint Proposed findings of Fact, Docket # 47, § I(5). The contract specifies in ¶ 3 that interest will accrue at the lesser of 18 percent per annum or any higher interest rate allowed by law for any late payment. Paragraph 3 also specifies that monies received shall be applied first to any penalties then to any interest due and finally to principal. We find 18 percent to be the applicable rate.

The transfer of the Ross Park Mall kiosk to Warman took effect on August 1, 1992, according to the contract. Although the contract required $2,500 of the $20,000 sales price to be paid upon execution of the agreement, the parties disagree as to whether this payment was made. Warman contends that the initial installment plus $11,000, for a total of $13,500, was paid toward the Ross Park

---

11. Warman's deposition testimony assessed a value of "$1000, maybe." Deposition Transcript of Christopher M. Warman dated August 23, 1995, at 116, line 6. According to Warman, the unit was "poorly built with pressed wood, not a laminated type of wood; Formica, the cabinets. So, they do not hold up well over a period of time. Then, it had a Formica counter top that was already warped by the time we took the unit

over." Deposition Transcript, at 115, line 24, to page 116, line 3.

12. According to the testimony of the parties, the Monroeville Mall kiosk was almost 1.5 times larger than and "upscale" of the Ross Park Mall kiosk.

Mall kiosk. Debtor acknowledges receipt of that amount but contends the payment was for some other purpose. Warman called Lillian Henry, the former bookkeeper for the defendants.[13] She issued the checks representing the initial payments for the Ross Park kiosk purchase. The two initial checks totaled $2,500. *See* Exhibit B to the Pretrial Stipulation, Docket #32. She testified that payments she made totaled $13,500 toward this purchase. Warman then instructed her to stop because Debtor owed defendants a considerable amount of money for fudge and Warman wanted to set off the obligations. We credit her testimony and find that $13,500 of the $20,000 was paid. Thus, there is an unpaid balance of $6,500.

The contract provides for 18 percent annual interest and we will utilize that rate. Debtor provided interest calculations on Exhibit U to Debtor's Pretrial Memorandum, Docket #40. However, Debtor's calculations assume a principal balance of $13,500, when, in fact, only $6,500 is due. Moreover, there is no evidence of record as to when the $6,500 was payable other than the payment schedule outlined in the contract.[14] It indicates that the full $20,000 was due to be paid by December 30, 1992. As a result, we will compute interest at 18 percent per annum on $6,500 from January 1, 1993, through March 31, 1997, as follows:

| Date | Interest | On A Principal Balance Of |
|------|----------|---------------------------|
| 1/1/93 | $ | $ 6,500.00 |
| 1/1/94 | 1,170.00 | 7,670.00 |
| 1/1/95 | 1,380.60 | 9,050.60 |
| 1/1/96 | 1,629.11 | 10,679.71 |
| 1/31/97 | 1,922.35 | 12,602.06 |
| 3/31/97 | 567.09 | 13,169.15 |

$6,669.15   **Total Unpaid Interest**

Because the $6,500 unpaid principal was taken into account in the stipulations of the parties, the only claim Debtor makes on the Ross Park Mall kiosk sale is for unpaid interest. We find that $6,669.15 is owed as interest through March 31, 1997. Thereafter,

interest will accrue at the Pennsylvania judgment rate of 6 percent inasmuch as the contract makes no provision for a post-judgment rate of interest.

To summarize: [15]

(1) The parties stipulated that defendants owe Debtor $12,900.70.

(2) We find that defendants owe $6,000 for the Monroeville Mall kiosk.

(3) We find that defendants owe $6,669.15 in interest for the Ross Park Mall kiosk.

(4) We find that Debtor owes $20,091.36 for fudge as itemized in the Joint Proposed Findings of Fact.

(5) The parties agreed that Debtor owes $600 in rent for the Strip District property.

Therefore, Debtor owes an additional $20,691.36 to defendants and defendants owe an additional $25,569.85 to Debtor. The net result is that defendants owe Debtor $4,878.49.

---

13. Ms. Henry is also the mother of deceased defendant Joni Schubert.

14. The historical transactions between the parties show a pattern of accruals of various liabilities and payments, credits and offsets against them that occurred regularly, but at differing intervals, from 1991 through 1993.

